Robert L. Starr (183052)
robert@starrlaw.com
Adam M. Rose (210880)
adam@starrlaw.com
Theodore R. Tang, Esq. (313294)
theodore@starrlaw.com
THE LAW OFFICE OF ROBERT L. STARR, APC
23901 Calabasas Road, STE #2072
Calabasas, CA 91302
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Attorneys for Plaintiff
Calabasas Luxury Motorcars, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALABASAS LUXURY MOTORCARS, INC., | Case No.: 2:21-cv-08825-DMG-AS |
| Plaintiff, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | 1. Violation of the Cartwright Act |
| BMW OF NORTH AMERICA, LLC; BMW FINANCIAL SERVICES NA, LLC; and DOES 1 through 100, inclusive, | 2. Violation of the Unfair Competition Law |
| Defendants. | |

## **INTRODUCTION**

1. Plaintiff Calabasas Luxury Motorcars brings this action to remedy and enjoin ongoing antitrust and state law violations which stem from Defendants BMW North America, LLC and BMW Financial Services NA, LLC's (collectively "Defendants") anticompetitive conduct.

2. As alleged below, Defendants have committed flagrant violations of antitrust law and inflicted widespread harm on both new and used automotive dealers; their

customers; and the automotive industry as a whole.

3.   Specifically, Defendants have conspired in an attempt, to the greatest extent possible, to eliminate the competition faced by BMW franchise dealerships with regard to the purchase and sale of used BMW vehicles. Defendants have done so by refusing to allow non-BMW franchise dealerships to purchase used BMW vehicles, leased through BMW Financial Services NA, LLC, as trade in vehicles, and by refusing to allow consumers to sell their used BMW vehicles, leased through BMW Financial Services NA, LLC to non-BMW franchise dealerships. Consequently, where there was once a robust market for third-party lease payoffs and BMW trade in vehicles, Defendants, through their coordinated conduct, have destroyed competition within that market from non-BMW franchise dealerships.

4.   Defendants have placed these artificial and anticompetitive restrictions on the used vehicle market for BMW vehicles in order to ensure that Defendants, and their franchise dealerships, maintain dominance over the entire market for used BMW vehicles. As a consequence of this anticompetitive conduct, Plaintiff and others similarly situated have suffered immense economic injury.

5.   As described in greater detail below, Defendants and their subsidiaries, agents, and co-conspirators entered into and implemented a continuing combination and conspiracy to fix, raise, maintain, or stabilize retail prices for and restrain trade for used BMW vehicles sold in California. This activity constitutes an unlawful combination, trust, agreement, understanding, and concert of actions in restraint of trade, in violation of California Business and Professions Code §§ 16700 *et seq.* and 17200 *et seq.*

6.   As a result of Defendants' unlawful conduct, Plaintiff and other members of the class have paid artificially inflated prices for used vehicles, have been prevented from purchasing used BMW vehicles from lessees where BMW Financial Services, LLC has been the lessor, and have been prevented from accepting said leased BMW

vehicles as trade in vehicles.

7.  Non-BMW franchise car dealers who accept trade in vehicles are direct targets of Defendants' conspiracy because Defendants are restraining and attempting to prevent competition within the secondary market for the purchase, sale, and trade in of used BMW vehicles by non-BMW franchise dealers.

8.  In seizing control over the secondary market for BMW vehicles wherein the lessor is BMW Financial Services, LLC, Defendants have thwarted Plaintiff and other dealers' ability to enter or trade in this market. Defendants have engaged in this conduct for no other purpose than to unlawfully enrich Defendants and BMW franchise dealers at the expense of Plaintiff and those similarly situated. Enriching BMW franchise dealers directly benefits Defendants.

## PARTIES

9.  Calabasas Luxury Motorcars ("Plaintiff") is a California corporation, with its principal place of business located in Los Angeles County, State of California.

10. Defendant BMW of North America, LLC ("BMW") is a Delaware limited liability company with its principal place of business located in Woodcliff Lake, New Jersey.

11. All acts and omissions of BMW's employees, agents, associates, partners, parents, or subsidiaries as alleged herein occurred while they were acting within the course and scope of their duties and BMW is therefore responsible to Plaintiff under the doctrine of Respondeat Superior and/or other doctrines.

12. Defendant BMW Financial Services NA, LLC ("BMWFS") is a Delaware limited liability company with its principal place of business located in Woodcliff Lake, New Jersey.

13. All acts and omissions of BMWFS's employees, agents, associates, partners, parents, or subsidiaries as alleged herein occurred while they were acting within the course and scope of their duties and BMWFS is therefore responsible to Plaintiff

1    under the doctrine of Respondeat Superior and/or other doctrines.

2    14. Plaintiff is unaware of the true names or capacities of the Defendants sued

3    herein as DOES 1 through 10, ("Doe Defendants"), and therefore sues said Doe

4    Defendants by such fictitious names. Plaintiff will seek leave of this Court to amend

5    this Complaint to insert the true names and capacities of such Doe Defendants when

6    such information has been obtained. Plaintiff is informed and believes, and based on

7    such information and belief alleges, that each of the fictitiously named Doe

8    Defendants participated in some way in the wrongful acts and omissions alleged

9    ## JURISDICTION AND VENUE

10   15. The Court has jurisdiction based on diversity of citizenship pursuant to 28

11   U.S.C § 1332(a).

12   16. This is a civil action in which the matter in controversy exceeds the sum of

13   $75,000, exclusive of interest and costs.

14   17. At least one member of the California Class is a citizen of a State different

15   from at least one Defendant within the meaning of 28 U.S.C. § 1332(d)(2)(A).

16   18. The claims asserted by the putative class, when aggregated as required by 28

17   U.S.C. § 1332(d)(6), exceeds the sum of $5,000,000 within the meaning of 28 U.S.C.

18   1332(d)(2).

19   19. The number of members of all putative classes alleged herein exceeds 100 in

20   number within the meaning of 28 U.S.C. § 1332(d)(5)(B).

21   20. The primary defendants are not States, State officials, or other governmental

22   entities within the meaning of 28 U.S.C. § 1332(d)(5)(A).

23   21. Venue is proper pursuant to 28 U.S.C. § 1391(a) because a substantial part of

24   the acts or omissions giving rise to this claim occurred in the Central District of

25   California.

26   22. This Court has supplemental jurisdiction over Plaintiffs' state law claims

27   arising under statutory or common law pursuant to 28 U.S.C. § 1367 because the

28

claims arise from a common nucleus of operative facts such that adjudication of both state and federal claims furthers the interests of judicial economy.

## FACTUAL ALLEGATIONS

23. As a direct outgrowth of the SARS-CoV-2 ("COVID-19") pandemic, there has been a severe disruption to the global supply chain of motor vehicles.

24. This major squeeze on vehicle production during the pandemic has resulted in a drastic shortage in supply. Consumer demand has outpaced supply. Not surprisingly, this confluence of low supply and high demand has catapulted used and new car prices to record highs.

25. This unprecedented demand for vehicles has created a situation where many lessees whose lease terms have either not yet expired or are expiring have found themselves in possession of vehicles whose market values—as calculated by California Civil Code § 2987—are significantly more than the amounts owed on their respective leases.

26. In layman's terms, as a result of high demand, these vehicles did not lose as much value as anticipated, and there is equity in these lease contracts.

27. Due to this increased equity, consumers are recognizing that they are able to trade in or sell their vehicles and cash in on the equity in their vehicles. Many consumers, realizing that the value of their vehicles exceeds the payoff of their vehicles, have sought to either terminate their leases early and sell their vehicles, or sell their vehicles at the end of their leases rather then turning the vehicles over to BMWFS.

## THE STRUCTURE OF VEHICLE LEASES & TRADE IN TRANSACTIONS

28. In calculating how much of a lease payment to charge consumers, BMWFS factors in the "expected depreciation of the vehicle" in determining the monthly lease payment. The prevailing interest rate is another factor used in determining the monthly payment. Lastly, BMWFS' profit is yet another factor. The lease agreement

itself will indicate that the vehicle has a residual value at the end of the lease. This residual value is theoretically intended to correlate with the amount of money that the vehicle will be worth at the end of the lease. The residual value, plus any other fees and costs, is the amount that must be paid if the lessee wishes to exercise the lease's purchase option at the end of the lease.

29. When the value of the vehicle winds up being higher than the payoff during the term of the lease, or winds up being more than the residual value at the end of the lease, then the vehicle has equity. If the vehicle has equity, this is because the lessee was paying more money than was actually necessary to cover the predetermined interest rate, the predetermined profit, and the actual depreciation of the vehicle's value during the term of the lease. Furthermore, in some circumstances, this may also occur if the vehicle goes up in value during the term of the lease.

30. With regard to BMWFS' closed-end consumer vehicle lease products, the consumer is always entitled to purchase the vehicle during the term of the lease, or at the end of the lease.

31. Additionally, pursuant to California law, the consumer lessee of a BMWFS closed end lease is entitled to trade in the vehicle during the term of the lease. If there is equity in the lease, the lessee can cash in on the vehicle's equity, either using the trade in value as a down payment for the purchase or lease of another vehicle or just collecting a cash payment for the equity. Vehicles being traded in is a common, established transaction in the automobile industry. In fact, even if there is not equity, or negative equity, consumers can still trade in their vehicles.

32. A practical example of this process occurs when a lessee will take their BMW to a non-BMW franchise dealer, trade in their BMW for a new vehicle, and the non-BMW franchise dealer will pay off the vehicle, with the consumer either paying the negative equity, or if there is equity, with the consumer using the equity towards the down payment of a new vehicle.

33. The ability of a consumer to trade in their vehicle is vital to consumer vehicle transactions. This is because most consumers lack the liquidity to come up with the money necessary to exercise their purchase option on their own, and lack the ability to sell their vehicle for fair market value after exercising the purchase option. If a consumer was unable to trade in their vehicle during the term of their lease, the consumer would often times simply be stuck with the vehicle. A consumer's ability to trade in their BMW vehicle to a non-BMW franchise dealer is a necessary option that must be available, in order to ensure a robust competitive market for consumers who wish to sell their vehicles, as well as ensuring a robust competitive market for non-BMW franchise dealers who wish to purchase and sell BMW vehicles and consumers who wish to purchase used BMW vehicles.

34. As a point of emphasis, the practice of "third-party payoffs" or vehicle trade in transactions is foundational to not only the used car business, but to the lessee's ability to capture any unexpected equity in their vehicles—a privilege implicit in the purchase option contained in every one of Defendants' lease agreements.

35. In fact, the practice of vehicles being traded in is so common that California statutorily codified a licensed vehicle dealer's duties with respect to trade in transactions.

36. Specifically, Cal. Vehicle Code § 11709.4 sets forth the manner in which a licensed motor vehicle dealer is supposed to pay off a leased vehicle that the dealer obtains as a trade in from a consumer who is leasing the vehicle from a finance company (Cal. Vehicle Code § 11709.4(a)(1)).

37. It should be noted that although § 11709.4 does not explicitly vest within all licensed dealers the ability to accept leased vehicles as trade in vehicles, it must be assumed that the legal right to accept leased vehicles as trade in vehicles necessarily exists. In other words, it would be implausible for the Legislature to regulate dealer conduct with respect to accepting leased vehicles as trade in vehicles if dealers did

not have the right to accept, and consumers did not have the right to present leased vehicles as trade in vehicles in the first instance. This is particularly true for closed end consumer leases which explicitly have ascertainable lease payoff amounts that can be quoted to consumers who wish to exercise the purchase option for their vehicles during the lease period and at the conclusion of the leases.

38. When, like here, a legislative enactment is silent on the issue of whether a dealer has the free right to accept a vehicle as a trade in, it must be assumed that such an omission does not signal disapproval, but rather, that the conduct is so inherent in the idea of the trade in itself, that it requires no statutory affirmation.

39. Similarly, Civil Code § 2987 discusses a lessee's right to early termination of a lease contract, conditions and notice. In explaining a consumer's rights, subdivision (f) states, "Subdivisions (b) to (d), inclusive, do not apply if, prior to the scheduled expiration date specified in the lease contract, the lessee terminates the lease and purchases the vehicle or trades in the vehicle in connection with the purchase or lease of another vehicle."

40. Pursuant to Ca. Civil Code § 2987, consumers have the right to terminate their lease early in connection with the purchase or lease of another vehicle, and when doing so, the money owed to the lessor is the payoff as amortized, based upon the financial structure of the lease. There is no reason why this right would be any different if a consumer simply wanted to trade in the leased vehicle, even if it was not in connection with the consumer purchasing another vehicle.

41. In light of a consumer's right to trade in their vehicle during its lease, as well as a non-BMW franchise dealer's right to accept trade in vehicles, we now turn to Defendants' unfair and unlawful business practices which form the basis for this Complaint.

///

///

## **DEFENDANTS' UNLAWFUL AND UNFAIR BUSINESS PRACTICES**

42. Recently, due to the shortage of vehicles, and due to the rise in used vehicle values, Defendants have willfully sought to place an unfair restraint on trade in violation of California law. Specifically, Defendants have engaged in a pattern and practice of collusive conduct amounting to unfair competition by refusing to allow non-BMW franchise dealerships to accept BMWFS leased BMW vehicles as trade in vehicles while simultaneously refusing to allow consumers to sell their BMWFS leased BMW vehicles to non-BMW franchise dealerships.

43. By way of example, let us suppose that a consumer who has 10 months left on their BMWFS lease is tired of driving the BMW and now wants to lease a different brand vehicle. When that consumer arrives at a non-BMW franchise dealership and attempts to trade in their BMWFS leased BMW vehicle, the non-BMW franchise dealer is prevented from accepting the vehicle because BMWFS refuses to allow non-BMW franchise dealerships to pay off BMWFS leased BMW vehicles as trade in vehicles. The same is true if the consumer attempts to trade in the vehicle, or sell the BMWFS leased BMW vehicle to an independent used vehicle dealership.

44. BMWFS will only allow consumers to trade in their BMWFS leased BMW vehicles to BMW franchise vehicle dealerships. That is to say, if a person is leasing a BMWFS leased BMW vehicle, they are essentially stuck with a BMW, and if they want to capture the equity in their vehicle, or trade in the vehicle during the lease, they are relegated to dealing strictly with BMW franchise dealerships. Furthermore, at the end of the lease, BMWFS refuses to allow consumers to sell their BMWFS leased BMW vehicles to non-BMW franchise dealerships in order for consumers to capture the equity in the BMWFS leased BMW vehicles. Furthermore, at the end of the lease, consumers can only sell these vehicles to BMW franchise dealerships or purchase the vehicles with their own money or credit. Defendants and BMW franchise dealerships thus have exerted unlawful control over the market, thereby

harming and interfering with the marketplace for used vehicles.

45. Phil Dilanni, a spokesman for BMW, is quoted as saying, "Our primary goal is to support BMW franchise dealers by creating opportunities to keep more vehicles in our franchise network." And "Therefore, we're prioritizing franchise dealers on our online auction platform to ensure they have more opportunities to purchase off-lease vehicles. In addition, we will temporarily suspend payoffs from third party dealers as of October 1." The leases are held by BMWFS, not BMW. Phil Dilanni is the Corporate Communications Manager for BMW, not BMWFS, further demonstrating that Defendants are actually acting in concert and colluding with each other to engage in restraint of trade and participate in an unlawful trust. The statements by Phil Dilanni are an admission of Defendants' wrongful restraint of trade.

46. By keeping BMW vehicles on the "BMW Merry-go-Round," Defendants are not only preventing consumers from selling their vehicles to non-BMW franchise dealerships, but Defendants are also preventing dealerships, such as Plaintiff, from exercising their rights to purchase these leased vehicles as trade in vehicles.

47. Not only that, but the "BMW Merry-go-Round" serves to prevent consumers from capturing the full equity in their vehicles by requiring consumers to trade in their BMWFS leased BMW vehicles only at BMW franchise dealerships, reducing the market for consumers to sell the vehicles, thus reducing competition and harming consumers. Disturbingly, this practice allows Defendants and BMW franchise dealerships to control the market by purchasing leased vehicles from consumers, and then selling the same vehicles as "Certified Pre-Owned" vehicles to different consumers.

48. Selling vehicles with a "Certified Pre-Owned" designation is an opportunity for BMW franchise dealerships to make more money on vehicles by further marking up the price. It is also an opportunity for BMW to sell an additional product—the "Certified Pre-Owned" warranty which is incorporated into the "Certified Pre-

Owned" designation.

49. Lastly, BMWFS offers captive financing for "Certified Pre-Owned" vehicles, giving BMWFS a slice of the pie. In this regard, Defendants are placing a restraint on trade in an effort to continue selling their products (Certified Pre-Owned warranty designation and financing), while unfairly harming non-BMW franchise dealerships and violating the letter and spirit of California law.

## **DEFENDANTS' ANTICOMPETITIVE CONDUCT**

50. At all times relevant, Defendants and others entered into and engaged in a continuing unlawful trust in restraint of trade and commerce, described above, in violation of Business and Profession Code § 16720.

51. These violations consisted of, but are not limited to, a continuing combination, trust, agreement, understanding, and concert of action among Defendants and others to restrain trade by refusing to allow non-BMW franchise dealerships to purchase BMWFS leased BMW vehicles as trade in vehicles, and refusing to allow consumers to sell their vehicles to non-BMW franchise dealerships.

52. For the purpose of forming and effectuating this unlawful trust, Defendants and others have agreed, combined, and conspired as alleged herein.

53. Defendants have colluded with each other to engage in the wrongful conduct alleged herein. Defendants have engaged in this conduct for their mutual benefit including, but not limited to (1) ensuring to the greatest degree possible that only BMW franchise dealerships have access to BMWFS leased BMW vehicles after they are traded in or sold at the end of the lease term; and (2) ensuring Defendants and BMW franchise dealers capture as much profit as possible by BMW franchise dealerships getting these vehicles, designating the vehicles as "Certified Pre-Owned" vehicles in order for the franchise dealers and BMW to make more money, and then reselling the vehicles to consumers who will finance the vehicles with BMWFS. This is textbook collusive conduct.

54. If Defendants' anticompetitive conduct is allowed to continue unabated, it will continue to stifle the sale of used BMW vehicles at non-BMW franchise dealerships. In other words, California residents will, for the most part, only be able to purchase a used previously leased BMWFS leased BMW vehicle from a BMW franchise dealership because BMWFS will not allow consumer lessees of BMWFS leased BMW vehicles to sell or trade in their leased vehicles to anyone other than a BMW franchise dealership. Although this conduct will not impact vehicles which are purchased by consumers rather than leased, by controlling the market for vehicles which have been leased, Defendants are seizing major control over the market of BMW vehicles. This is because a large percentage of new BMW vehicles that are acquired new by consumers in California are acquired through lease rather than purchase.

55. In cornering the market for previously leased BMWFS BMW vehicles, actual and future competition between Defendants, Plaintiff, and those similarly situated will be eliminated, or substantially reduced, and prices for BMW's used vehicles will rise to levels they would never have risen in the absence of Defendants' monopolistic and anticompetitive conduct. Furthermore, consumers who wish to sell their BMWFS leased BMW vehicles will have reduced options, will enjoy less competition for the purchase of their vehicles, and thus will receive less money when selling or trading in their leased vehicles.

56. As a proximate result of the Defendants' unlawful contract, combination, or conspiracy, Plaintiff and those similarly situated have sustained damages, and will in the future sustain damages to their businesses and property in an amount in excess of the jurisdictional minimum.

///

///

///

## <u>ALLEGATIONS RELEVANT TO PLAINTIFF</u>

57. At all times herein relevant, Plaintiff, a high-end luxury used vehicle dealership, has had numerous customers attempt to trade in their BMWFS leased BMW vehicles to Plaintiff, or sell their BMWFS leased BMW vehicles to Plaintiff, only to have Defendants refuse and prohibit any attempt by Plaintiff to accept these vehicles as  trade in vehicles. Defendants have refused to allow Plaintiff to pay off the vehicles and take ownership. Instead, Defendants will only allow consumers to trade in their vehicles with a BMW franchise dealership.

58. Indeed, a November 4, 2021, correspondence from BMWFS clearly states that BMWFS only allows "purchase of [a] leased vehicle or return or trade in vehicle to an authorized BMW Center. BMW Financial Services will not honor payoffs received from third-party dealerships. In the event a payoff is received from a third-party dealership, BMW Financial Services will return the payment by mail to the original sender."

59. BMWFS has even gone as far as to tell consumers who are seeking to pay off their BMWFS leased vehicles, "**Titling Instructions**: Due to state regulations, the title can only be transferred to the original lessee or a BMW Center." This statement by BMWFS is misinformation directed at consumers, specifically designed to mislead consumers into believing that state law actually prevents consumers from selling their BMWFS leased BMW vehicles to non-BMW franchise dealers.

60. In essence, Defendants have cornered the prospective used vehicle market for BMWFS leased BMW vehicles by refusing to allow lessees to trade in their vehicles to any dealership other than BMW franchise dealers.

61. Defendants' conduct as alleged herein violates California's unfair business practices statute, California Business and Professions Code § 16700 et seq., and Business and Professions Code § 17200 et seq. (the "UCL").

62. Plaintiff and the putative class have suffered damage as a result of Defendants'

1  wrongful, unfair, and unlawful conduct.

2  63. Plaintiff seeks injunctive relief compelling Defendants to immediately cease

3  violating California law by refusing to allow consumers to trade in their BMWFS

4  leased BMW vehicles to non-BMW franchise dealerships and by refusing to allow

5  non-BMW franchise vehicle dealerships to purchase BMWFS leased BMW vehicles.

6  **CLASS ACTION ALLEGATIONS**

7  64. Plaintiff brings this action on behalf of itself, and all others similarly situated.

8  65. The class consists of all non-BMW franchise vehicle dealerships in California

9  whose right to accept BMWFS leased BMW vehicles as trade in vehicles and whose

10  right to purchase BMWFS leased BMW vehicles has in the past been or will in the

11  future will be infringed upon and violated, and who have or will suffer damage, as a

12  result of Defendants' unfair, unlawful, and anticompetitive conduct as stated herein.

13  66. Plaintiff reserves the right to establish subclasses.

14  67. There is a well-defined community of interest, and the class is readily

15  ascertainable:

16  (a)  Numerosity: The members of the class are so numerous that joinder is

17  unfeasible and impractical. The membership of the entire class is unknown to

18  Plaintiff at this time. However, the class is estimated to be greater than 100

19  individuals and the identity of such membership is readily ascertainable.

20  (b)  Typicality: Plaintiff's claims are typical of the class members with

21  whom it has a well-defined community of interest.

22  (c)  Adequacy: Plaintiff will fairly and adequately protect the interests of

23  each class member. Plaintiff acknowledges it has an obligation to make known any

24  relationship, conflicts, or differences with any class member. Plaintiffs' attorneys are

25  versed in the rules governing class action discovery, certification, and settlement.

26  Plaintiff has incurred and will continue to incur costs and attorneys' fees to prosecute

27  the action for the benefit of each class member.

28

(d)   Superiority: Class action adjudication is superior to other methods, as it will achieve economies of time, effort and expense compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner for the entire class.

68. There are common questions of law and fact as to the class (and subclass, if any) that predominate over questions affecting only individuals, including but not limited to whether Defendants engaged in unfair competition, and whether Plaintiff and class members are entitled to injunctive relief enjoining Defendants from refusing to allow vehicle trade in transactions with non-BMW franchise dealerships.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE CARTWRIGHT ACT

### (Against All Defendants)

69. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the paragraphs above and, to the extent necessary, pleads this cause of action in the alternative.

70. At all times relevant, Defendants and their co-conspirators entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade and commerce in violation of the Cartwright Act, California Business and Professions Code § 16700 et seq.

71. As alleged herein, Defendants, by their unlawful conspiracy, have artificially placed a restraint on trade and artificially fixed, raised, inflated, and interfered with the market for used BMW vehicles in violation of California Business and Professions Code § 16700 et seq.

72. The contract, combination, or conspiracy consisted of and consists of a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and allocate the market for and restrain trade relating to used

1  BMW vehicles.

2  73. For the purpose of formulating and effectuating their contract, combination, or

3  conspiracy, Defendants and their co-conspirators contracted, combined, and

4  conspired by knowingly and intentionally refusing to allow non-BMW franchise

5  dealers to accept BMWFS leased BMW vehicles as trade in vehicles, and refusing

6  allow non-BMW franchise dealers to purchase BMWFS leased BMW vehicles from

7  consumers. Defendants' conduct was in derogation of Plaintiff's rights, the rights of

8  consumers, and the rights of the putative class.

9  74. As a direct result of the unlawful conduct of Defendants and their co-

10  conspirators in furtherance of their continuing contract, combination, or conspiracy,

11  Plaintiff and those similarly situated have been injured in their business and property

12  and have suffered damage due to Defendants' restraint of trade as alleged herein.

13  75. Plaintiff and those similarly situated would never have faced these barriers to

14  commerce or entrance into the market in the absence of Defendants' and their co-

15  conspirators anticompetitive conduct as alleged herein.

16  76. The result of this illegal anticompetitive activity is that there is a reduced

17  number of used BMW vehicles available on the market for purchase by non-BMW

18  franchise dealers for resale. Such conduct stifles competition, harms consumers, and

19  harms the putative class.

20  77. Defendants have, by their conduct, engaged in a violation of the Cartwright

21  Act.

22  78. Defendants' conduct as alleged herein presents a continuing threat to the

23  existence and vitality of the used car market, and these unlawful acts will persist and

24  continue unless and until this Court issues appropriate injunctive relief.

25  79. Plaintiff also seeks actual damages, treble damages, attorneys' fees, and costs.

26  ///

27  ///

28

## SECOND CAUSE OF ACTION

## VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200

### (Against All Defendants)

80. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the paragraphs above and, to the extent necessary, pleads this cause of action in the alternative.

81. California Business and Professions Code § 17200 prohibits acts of unfair competition, including any "unlawful, unfair, or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising."

82. As alleged herein, Defendants have engaged in unlawful and unfair business practices.

83. Plaintiff and Defendants are "persons" as that term is defined in Business and Professions Code § 17201.

84. Defendants violated the UCL by knowingly and intentionally refusing to allow non-BMW franchise dealers to accept BMWFS leased BMW vehicles as trade in vehicles and by refusing to allow non-BMW franchise dealers to purchase BMWFS leased BMW vehicles from consumers, in violation of the law.

85. Defendants' unlawful and unfair business acts and practices as alleged herein caused damage to Plaintiff and other putative class members.

86. As a direct and proximate result of Defendants' acts and practices in violation of the UCL, Plaintiff and the putative class have suffered injury in fact and lost money or property and will continue to do so.

### Unfair Prong

87. An act or practice is "unfair" if the consumer injury is substantial; is not outweighed by any countervailing benefits to consumers or to competition; and is not an injury the consumers themselves could reasonably have avoided. An act or practice also is unfair if it offends an established public policy or is immoral,

unethical, oppressive, unscrupulous, or substantially injurious to consumers. An act or practice also is unfair if Plaintiff's claims are "tethered" to specific constitutional, statutory or regulatory provisions.

88. Defendants' actions constitute an "unfair" business practice because Defendants refuse to allow Plaintiff and the putative class to exercise their right to purchase BMWFS leased BMW vehicles as trade in vehicles, and because Defendants refuse to allow Plaintiff and the putative class to purchase BMWFS leased BMW vehicles from consumers, in violation of the law and in furtherance of Defendants' efforts to restrain trade.

89. Defendants' business practices are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers in that consumers are being prevented from exercising their statutory rights as alleged herein.

90. Additionally, this conduct is "unfair" because it violates a specific constitutional, statutory or regulatory provision. Here, Defendants' unfair conduct is tethered to its interference with Plaintiff's rights as alleged herein.

91. All of the acts and practices of Defendants as described in this complaint constitute "unfair" business acts and practices. A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims. Plaintiff has suffered injury in fact and a loss of money or property as a result of Defendants' unfair business acts and practices as set forth herein.

92. Defendants' conduct is unfair because it prevents consumers from having a free market for lawfully selling their BMWFS leased BMW vehicles, because it prevents consumers from capturing the full extent of equity in their vehicles, and because it is an unlawful restrain on trade which harms Plaintiff and the putative class.

93. From a practical perspective, consumers often lack the desire or liquidity to pay off their leased vehicles and sell them. As a result, due to Defendants' wrongful conduct, BMWFS lessees who wish to terminate their lease early or capture any of the equity in their lease are forced to do so at a BMW franchise dealership. This unfair and unlawful conduct harms competition, restrains trade and unfairly prevents non-BMW franchise dealerships from being able to purchase BMWFS leased BMW vehicles.

94. As a direct and proximate result of Defendants' acts and practices in violation of the UCL, Plaintiff and the putative class have suffered damages.

95. Defendants' conduct does not benefit consumers or competition. Plaintiff could not reasonably avoid the injury suffered or the injury that will be suffered. Defendants' conduct only benefits Defendants and BMW franchise dealers.

96. The gravity of the conduct as described above outweighs the justification, motive, or reason therefor, is immoral, unethical, and unscrupulous, and offends established public policy that is tethered to legislatively declared policies as set forth in the laws detailed above, and is substantially injurious to the public, for the reasons set forth above.

97. Defendants could have and should have furthered their legitimate business interests and legal obligations by allowing non-BMW franchise dealerships to accept BMWFS leased BMW vehicles as trade in vehicles.

98. Defendants could have and should have furthered their legitimate business interests and legal obligations by abstaining from aggressively interfering with the rights of Plaintiff and the putative class, as well as consumers.

99. To the extent that any definition of "unfair" requires a balancing test or weighing various factors, such an inquiry is fact intensive and requires a full factual record as to Defendants' justification and motives for its conduct, and as to the impact of Defendants' conduct on Plaintiff and others.

100. Defendants' acts of unfair competition as set forth above present a continuing threat and will persist and continue to do so unless and until this Court issues appropriate injunctive relief. Plaintiff also seeks attorneys' fees and costs.

**Unlawful Prong**

101. A business practice is "unlawful" under the UCL if it is forbidden by law or regulations, including the standard of professional conduct.

102. The violation of any law or regulation may serve as the predicate for a violation of the "unlawful" prong of the UCL.

103. A California consumer who has entered into a closed end vehicle lease has the right to terminate a lease contract at any time prior to the date specified in the lease contract. There is a mathematical methodology which is utilized to determine the vehicle payoff when the lease is being terminated early. When BMWFS consumers attempt to terminate the lease of their BMWFS leased BMW vehicle by trading in or selling their leased vehicles at non-BMW franchise dealerships, Defendants interfere with this right by arbitrarily and capriciously refusing to allow the vehicle to be traded in at a non-BMW franchise dealership, and thus imposing unfair and unreasonable restrictions on a non-BMW franchise dealer's right to accept the vehicle as a trade in. Similarly, BMWFS refuses to allow BMWFS leased BMW vehicles to be sold to non-BMW franchise dealers by consumers at the end of the lease. The only actual reason that Defendants engage in such conduct is to gain an unfair advantage in the marketplace.

104. Defendants have, by their conduct, engaged in unfair competition and unlawful and unfair business practices.

105. Defendants' acts of unlawful competition as set forth above present a continuing threat to the existence and vitality of the used car market, and these unlawful acts will persist and continue unless and until this Court issues appropriate injunctive relief.

106. Plaintiff also seeks attorneys' fees and costs pursuant to, *inter alia*, C.C.P. § 1021.5.

## JURY DEMAND

107. Plaintiff hereby demands a trial by jury on all issues of fact.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

First Cause of Action

1. An order certifying the proposed Class, designating Plaintiff as named representative of the Class, and designating the Plaintiff's Counsel as Class Counsel

2. An order requiring Defendants to pay for the cost of giving notice to the Class of Defendants' wrongful conduct

3. For an order enjoining Defendants from continuing the unlawful combination and conspiracy alleged in this Complaint

4. An award of damages to Plaintiff and those similarly situated in an amount to be trebled under antitrust law

5. Attorneys' fees and costs

6. Pre-judgment interest; and

7. For other relief that this Court deems just and proper.

Second Cause of Action

1. An order certifying the proposed Class, designating Plaintiff as named representative of the Class, and designating the Plaintiff's Counsel as Class Counsel

2. An order requiring Defendants to pay for the cost of giving notice to the Class of Defendants' wrongful conduct

3. For an order enjoining Defendants from continuing the unlawful and unfair conduct alleged in this Complaint

4.  For an order enjoining Defendants from refusing to allow vehicle dealerships the ability to exercise their statutory right to accept vehicle trade in vehicles pursuant to Vehicle Code § 11709.

5.  Attorneys' fees and costs pursuant to Code of Civil Procedure § 1021.5

6.  Pre-judgment interest; and

7.  For other relief that this Court deems just and proper.

Date: December 26, 2021                LAW OFFICE OF ROBERT L. STARR

/S/

_____

Robert L. Starr
Attorney for Plaintiff
Calabasas Luxury Motorcars, Inc.

FIRST AMENDED CLASS ACTION COMPLAINT